**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| ) | |
| ) | |
| **IN RE: PARAQUAT PRODUCTS** ) | Case No. 3:21-md-3004-NJR |
| **LIABILITY LITIGATION** ) | |
| ) | MDL No. 3004 |
| This document relates to: ) | |
| ) | Hon. Judge Nancy J. Rosenstengel |
| *Burgener v. Syngenta AG et al.,* ) | |
| No. 3:21-pq-01218-NJR ) | |

<u>**DEFENDANTS SYNGENTA CROP PROTECTION, LLC AND SYNGENTA AG'S**</u>
<u>**ANSWER AND DEFENSES**</u>

Defendants Syngenta Crop Protection, LLC and Syngenta AG (collectively, "Syngenta"),

through undersigned counsel, answers the correspondingly numbered paragraphs of the Complaint

of Plaintiff Todd Burgener as follows:

<u>**ANSWER**[1]</u>

## I.      SUMMARY OF THE CASE[2]

1.      Paraquat is a synthetic chemical compound[3] that since the mid-1960s has been

developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in

herbicide products ("paraquat") developed, registered, formulated, distributed, and sold for use in

the United States, including the State of Illinois.

---

[1]    For purposes of this Answer, Syngenta provides consecutive paragraph numbering and notes
for the record that paragraph numbers 55-56, 100-108 and 142-158 were inadvertently omitted
in Plaintiff's original complaint.

[2]    Headings from the Complaint are restated here only for ease of reference and are not
incorporated herein.

[3]    Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA
Pesticide Chemical Code 061602).

**ANSWER**:    Admitted.

2.      Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold paraquat for use in Illinois, acted in concert with others who manufactured, distributed, and sold paraquat for use in Illinois, sold and used paraquat in Illinois, or owned property in Illinois where paraquat was used.

**ANSWER**:    Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture and sale of paraquat.  Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

3.      Plaintiff brings this suit against Defendants to recover damages for personal injuries resulting from his exposure to paraquat from approximately 1989-present working as a sprayer and mixer for Growmark, Inc., in Illinois.

**ANSWER**:    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

## II.    PARTIES

### A.    Plaintiff

4.      Plaintiff is a citizen and resident of the State of Illinois who suffers from Parkinson's disease ("PD") caused by exposure to paraquat[4] while working as a sprayer and mixer for Growmark, Inc., in Illinois.

---

[4]    Unless the context indicates otherwise, references in this complaint to "paraquat" include the chemical compound paraquat dichloride and formulated herbicide products containing paraquat dichloride as an active ingredient.

**ANSWER:**    Syngenta denies that Plaintiff's alleged illness was caused by exposure to paraquat. Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

   **B.    Defendants**

   5.    Defendant Syngenta Crop Protection LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant Syngenta AG.

**ANSWER:**    Syngenta admits that Syngenta Crop Protection, LLC is a Delaware Limited Liability Company with its principal place of business in Greensboro, North Carolina.  Syngenta admits that Syngenta Crop Protection, LLC is an indirect, wholly owned subsidiary of Defendant Syngenta AG.

   6.    Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland.

**ANSWER:**    Admitted.

**III.    JURISDICTION AND VENUE**

   7.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of citizenship between the Plaintiff and the Defendants and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:**    This paragraph calls for a legal conclusion to which no response is due.

   8.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because at least one defendant resides in this judicial district and all defendants are residents of the State in which this district is located because they are subject to this Court's personal jurisdiction with respect to

this action. Further, this action may be filed in this District because Case Management Order No. 1 issued by this Court provides that any plaintiff whose case would be subject to transfer to MDL 3004 may file his or her case directly in MDL 3004 in the Southern District of Illinois. This case, if filed in another federal district court, would be subject to transfer to MDL 3004.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

## IV.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    Defendants and their predecessors.

#### 1.    *Syngenta Crop Protection LLC and Syngenta AG*

9.    In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

**ANSWER:**    Syngenta admits that Imperial Chemical Industries PLC was formed in 1926 from the merger of four British chemical companies.  To the extent not specifically admitted herein, denied.

10.    In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively "ICI Americas").

**ANSWER:**    Syngenta admits that ICI acquired Atlas Chemical Industries, a Delaware company, in 1971.  To the extent not specifically admitted herein, denied.

11.    In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a

wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

**ANSWER:**    Syngenta admits that in 1992, ICI merged several businesses into a subsidiary that became known as ICI Bioscience Ltd.  To the extent not specifically admitted herein, denied.

12.    In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

**ANSWER:**    Syngenta admits that in 1993, ICI demerged several businesses including pharmaceuticals, agrochemicals, and specialty chemicals into the Zeneca Group PLC.  To the extent not specifically admitted herein, denied.

13.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

**ANSWER:**    Syngenta admits that ICI Americas was demerged from ICI and became Zeneca, Inc., a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.  To the extent not specifically admitted herein, denied.

14.    Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

**ANSWER:**    Syngenta admits that ICI had a Central Toxicology Laboratory that performed and coordinated studies related to paraquat and other pesticides that were submitted to the USDA and EPA.  To the extent not specifically admitted herein, denied.

15.    As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

**ANSWER:**    Syngenta admits that ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.  To the extent not specifically admitted herein, denied.

16.    After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

**ANSWER:**    Syngenta admits that Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and coordinate studies related to paraquat and other pesticides that were submitted to EPA.  To the extent not specifically admitted herein, denied.

17.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

**ANSWER:**    Syngenta admits that ICI Americas was demerged from ICI and became Zeneca, Inc., a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.  To the extent not specifically admitted herein, denied.

18.     In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

**ANSWER**:     Admitted.

19.     As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

**ANSWER**:     Syngenta admits that the Novartis Group was formed through a merger that included Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York.  Syngenta further admits that Ciba-Geigy Corporation was a predecessor of NCPI, a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.  To the extent not specifically admitted herein, denied.

20.     In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

**ANSWER**:     Syngenta admits that in 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. was a wholly owned subsidiary.  To the extent not specifically admitted herein, denied.

21.     In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create

the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

**ANSWER:**    Syngenta admits that Syngenta AG was formed in 2000 as a result of the demerger of the Novartis agribusiness from Novartis AG and of the Zeneca agrochemicals business from AstraZeneca PLC, and the combination of these businesses into Syngenta AG.  To the extent not specifically admitted herein, denied.

22.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

**ANSWER:**    Syngenta admits that as a result of the spinoff and merger that created Syngenta AG, Zeneca Ltd. was renamed Syngenta Ltd., a wholly owned British subsidiary of SAG. To the extent not specifically admitted herein, denied.

23.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

**ANSWER:**    Syngenta admits that after the spinoff and merger that created Syngenta AG, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.  To the extent not specifically admitted herein, denied.

24.    Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others

to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

**ANSWER:**    Syngenta admits that for a certain period of time Syngenta Ltd.'s Central Toxicology Laboratory continued to perform and coordinate studies related to paraquat and other pesticides that were submitted to the EPA.  Syngenta also admits that it funded studies performed by independent scientists related to paraquat and other pesticides that were submitted to the EPA. To the extent not specifically admitted herein, denied.

25.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

**ANSWER:**    Syngenta denies the allegations.

26.    In 2010, SCPI was converted into Defendant Syngenta Crop Protection LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

**ANSWER:**    Syngenta admits that Syngenta Crop Protection, Inc. became Syngenta Crop Protection, LLC on December 31, 2010.  Syngenta admits that Syngenta Crop Protection, LLC is a Delaware Limited Liability Company with its principal place of business in Greensboro, North Carolina.  To the extent not specifically admitted herein, denied.

27.    SAG is a successor in interest to the crop-protection business of its corporate predecessor Novartis AG.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

28.     SAG is a successor in interest to the crop-protection business of its corporate predecessor AstraZeneca PLC.

**ANSWER:**     This paragraph contains legal conclusions to which no response is due.

29.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Group PLC.

**ANSWER:**     This paragraph contains legal conclusions to which no response is due.

30.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

**ANSWER:**     This paragraph contains legal conclusions to which no response is due.

31.     SAG is a successor in interest to the crop-protection business of its corporate predecessor ICI Bioscience Ltd.

**ANSWER:**     This paragraph contains legal conclusions to which no response is due.

32.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Plant Protection Ltd.

**ANSWER:**     This paragraph contains legal conclusions to which no response is due.

33.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor SCPI.

**ANSWER:**     This paragraph contains legal conclusions to which no response is due.

34.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor NCPI.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

35.    SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Ciba-Geigy Corporation.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

36.    SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Inc.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

37.    SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is due, Syngenta denies the allegations.

38.    SCPLLC is registered to do business in the State of Illinois, with its registered office in Chicago, Illinois.

**ANSWER:**    Admitted.

39.    SCPLLC does substantial business in the State of Illinois, including the following:

      a.    markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Illinois;

      b.    secures and maintains the registration of paraquat and other pesticides with the EPA and the Illinois Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use these products in the State of Illinois; and

      c.      performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Illinois.

**ANSWER:**    Syngenta admits that, since approximately 2011, SCPLLC has transacted business in Illinois, including by marketing, advertising, selling, distributing, and delivering products containing paraquat and certain other pesticides to distributors, cooperatives, and local dealers in certain parts of Illinois. Syngenta admits that SCPLLC, at certain times, has conducted or commissioned field research on paraquat and other pesticide products in Illinois. Syngenta further admits that it has registrations for paraquat and other pesticides with the EPA and the Illinois Department of Agriculture. Since at least 2005, Syngenta has not sold paraquat to distributors or retailers in St. Clair County. To the extent not specifically admitted herein, denied.

40.    SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

**ANSWER:**    Admitted.

41.    SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

**ANSWER:**    Syngenta admits that SCPLLC is owned by Syngenta Seeds, LLC, which is owned by Syngenta Corporation, which is owned by Syngenta Participations AG, which is owned by SAG.  To the extent not specifically admitted herein, denied.

42.    SAG is a management holding company.

**ANSWER:**    Syngenta admits that SAG has direct and indirect ownership of certain Syngenta subsidiaries.  To the extent not specifically admitted herein, denied.

43.    Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

**ANSWER:**    Admitted.

44.    SCPAG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.

**ANSWER:**    Syngenta admits that many Basel based employees for Syngenta's commercial operations relating to CP and Seeds are employed by SCPAG.  To the extent not specifically admitted herein, denied.

45.    The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.

**ANSWER:**    Syngenta admits that Syngenta AG's business is currently divided in CP and Seeds units.  To the extent not specifically admitted herein, denied.

46.    The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

**ANSWER:**    Syngenta denies the allegations.

47.    SCP AG directly and wholly owns Syngenta International AG ("SIAG").

**ANSWER:**    Syngenta denies the allegations.

48.    SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

**ANSWER:**    Syngenta denies the allegations.

49.    SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

**ANSWER:**    Syngenta denies the allegations.

50.     SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

**ANSWER:**    Syngenta denies that Syngenta International AG is an existing entity and therefore denies the allegations.

51.     Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

**ANSWER:**    Syngenta denies the allegations.

52.     SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

> a.     SAG directly and wholly owns Syngenta Participations AG;
>
> b.     Syngenta Participations AG directly and wholly owns Seeds JV C.V.;
>
> c.     Seeds JV C.V. directly and wholly owns Syngenta Corporation;
>
> d.     Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC; and
>
> e.     Syngenta Seeds, LLC directly and wholly owns SCPLLC.

**ANSWER:**    Syngenta admits that SAG is the indirect parent of SCPLLC, but denies that the allegation accurately reflects the relevant corporate structure.

53.     Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

**ANSWER:**    Admitted.

54.     SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

**ANSWER:**    Syngenta Group did not exist in 2019 and therefore Syngenta denies the allegations.

55.    SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

**ANSWER:**    Syngenta denies the allegations.

56.    Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

**ANSWER:**    Syngenta denies the allegations.

57.    The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

**ANSWER:**    Syngenta denies the allegations.

58.    SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

**ANSWER:**    Syngenta denies the allegations.

59.    SAG' s board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

**ANSWER:**    Syngenta admits that, at the time this complaint was filed, the Board of Directors of SAG had established the Syngenta Executive Committee (hereinafter, "SEC"). Syngenta denies the remaining allegations and specifically denies that the SEC made decisions for SCPLLC.

60.    The SEC consists of the CEO and various global Heads, which currently are:

      a.    The Chief Executive Officer;

      b.    Group General Counsel;

      c.    The President of Global Crop Protection;

      d.    The Chief Financial Officer;

      e.    The President of Global Seeds; and

      f.    The Head of Human Resources.

**ANSWER:**    Syngenta denies the allegations.

61.    STAG employs all of the members of the Executive Committee.

**ANSWER:**    Syngenta denies the allegations.

62.    Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

**ANSWER:**    Syngenta denies the allegations.

63.    SAG's board of directors meets five to six times a year.

**ANSWER:**    Syngenta admits that the SAG Board of Directors generally meets five to seven times per year, but may meet as often as business requires.  To the extent not specifically admitted herein, denied.

64.    In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

**ANSWER:**    Syngenta admits that the SCPI Board of Directors often exercised its duties by unanimous written consent, consistent with corporate law and sound corporate governance practices. To the extent not specifically admitted herein, denied.

65.    Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

**ANSWER:**    Syngenta admits that the SCPI Board of Directors often exercised its duties by unanimous written consent, consistent with corporate law and sound corporate governance practices. Syngenta also admits that from time to time SCPI consulted with and sought advice or support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain matters—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPI was responsible for making its own business decisions. To the extent not specifically admitted herein, denied.

66.    Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice or support from individuals or governance bodies located in one of its direct or indirect parent

companies with regard to certain matters—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for making its own business decisions. To the extent not specifically admitted herein, denied.

67.    Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

**ANSWER:**    Syngenta admits that Syngenta Seeds, Inc. may from time to time have consulted with and sought advice or support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to the appointment of SCPI board members—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that Syngenta Seeds is responsible for making its own business decisions.  To the extent not specifically admitted herein, denied.

68.    Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice or support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain matters—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for making its own business decisions.  To the extent not specifically admitted herein, denied.

69.     The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

**ANSWER:**     Syngenta denies the allegations.

70.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

**ANSWER:**     Syngenta admits that it has a CP Leadership Team, which includes the President of Global Crop Protection and certain other employees.  To the extent not specifically admitted herein, denied.

71.     The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

**ANSWER:**     Syngenta denies the allegations.

72.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Croup's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

**ANSWER:**     Syngenta denies the allegations.

73.    The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

**ANSWER:**    Syngenta admits that the North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company), but denies that Plaintiffs have provided a complete and accurate description of Syngenta's corporate structure.

74.    The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

**ANSWER:**    Syngenta denies the allegations.

75.    Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

**ANSWER:**    Syngenta denies the allegations.

76.    Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

**ANSWER:**    Syngenta admits that, for a limited number of senior-level employees, SCPLLC consults with and seeks advice or support from individuals or governance bodies located in one of

its direct or indirect parent companies with regard to certain matters—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for making its own business decisions.  To the extent not specifically admitted herein, denied.

77.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

**ANSWER:**     Syngenta denies the allegations.

78.     SCPLLC performs its functions according to its role in the CP Division structure:

    a.     CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

    b.     New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

    c.     These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

    d.     Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

    e.     Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

    f.     If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the

target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.    Decisions to sell the product must be approved by the SEC; and

h.    The products that are sold all bear the same Syngenta trademark and logo.

**ANSWER:**    Syngenta admits that SCPLLC conducts certain commercial operations relating to crop protection products and certain marketing activities and that some SCPLLC products bear the Syngenta trademark and logo.  To the extent not specifically admitted herein, denied.

79.    SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice or support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain matters—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for making its own business decisions.  To the extent not specifically admitted herein, denied.

80.    These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice or support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain matters—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered

and foreign-headquartered corporations—but states that each Syngenta company is responsible for making its own business decisions. To the extent not specifically admitted herein, denied.

81.    For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

**ANSWER:**    Syngenta admits that—consistent with corporate law, appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—it may consult with and seek approval from SAG's board of directors regarding the decision to settle certain lawsuits, however, Syngenta denies that SCPLLC is only responsible for "small legal matters."  To the extent not specifically admitted herein, denied.

82.    Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice and support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to appointment of the Regional Directors-North America and managers reporting directly to them—consistent with corporate law and appropriate corporate-governance practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for appointing its own managers.  To the extent not specifically admitted herein, denied.

83.     Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

**ANSWER:**     Syngenta admits that from time to time SCPLLC consults with and seeks advice and support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to appointment of the Regional Directors-North America and managers reporting directly to them—consistent with corporate law and appropriate corporate-governance practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for appointing its own managers.  To the extent not specifically admitted herein, denied.

84.     Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

**ANSWER:**     Syngenta admits that from time to time SCPLLC consults with and seeks advice and support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain matters—consistent with corporate law and appropriate corporate-governance practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC makes its own decisions concerning its business activities.  To the extent not specifically admitted herein, denied.

85.     SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

a.      Product development;

      b.       Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

      c.       Production;

      d.       Marketing;

      e.       Sales;

      f.       Human resources;

      g.       Communications and public affairs;

      h.       Corporate structure and ownership

      i.       Asset sales and acquisitions

      j.       Key appointments to boards, committees and management positions;

      k.       Compensation packages;

      l.       Training for high-level positions; and

      m.       Finance (including day-to-day cash management) and tax.

**<u>ANSWER</u>:**     Syngenta admits that from time to time SCPLLC consults with and seeks advice and support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain matters—consistent with corporate law and appropriate corporate-governance practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC makes its own decisions concerning its business activities, including product development and testing, production, marketing, sales, human resources, communications and public affairs, compensation, training, and regular cash management. Syngenta admits that, consistent with corporate law and appropriate corporate-governance practices, appointments to the SCPLLC board are the responsibility of SCPLLC's shareholder. Syngenta further admits that, certain finance and tax functions are made in

consultation with other affiliated companies to leverage technical expertise and ensure Syngenta's compliance with all relevant regulations, but that SCPLLC is responsible for its own finances and tax compliance. To the extent not specifically admitted herein, denied.

86.     Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees, international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

**ANSWER:**     Syngenta admits that employee review, compensation, and international assignments are some of the functions that are the subject of consultation among it and certain affiliated companies, with the involvement of the global head of human resources to ensure compliance with all relevant regulations.  To the extent not specifically admitted herein, denied.

87.     Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

**ANSWER:**     Syngenta admits that employees at various levels may be seconded to work at other SAG subsidiaries based on many factors including business needs and the wishes of the individual employee.  To the extent not specifically admitted herein, denied.

88.     The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

**ANSWER:**    Syngenta admits that it has a centralized treasury department that may provide finance and human resources support to affiliates.  To the extent not specifically admitted herein, denied.

89.    The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice and support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain finance matters—consistent with appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but states that SCPLLC is responsible for its own finances.  To the extent not specifically admitted herein, denied.

90.    Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

**ANSWER:**    Syngenta admits that from time to time SCPLLC consults with and seeks advice and support from individuals or governance bodies located in one of its direct or indirect parent companies with regard to certain finance matters, and participates in certain cash-sweep and treasury activities with other companies directly or indirectly affiliated with Syngenta—consistent with appropriate corporate-governance practices, and sound management practices broadly followed by U.S.-headquartered and foreign-headquartered corporations—but that SCPLLC is responsible for its own finances.  To the extent not specifically admitted herein, denied.

91.     The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

**ANSWER:**    Syngenta denies the allegations.

92.     Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

**ANSWER:**    Syngenta denies the allegations.

93.     SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

**ANSWER:**    Syngenta admits that SCPLLC's board or management approves dividends and distributions, but denies these distributions are "mandated" or approved "without any meaningful deliberation." To the extent not specifically admitted herein, denied.

94.     In 2011, the U.S. District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, ill. v. Syngenta Crop Protection, Inc.,* 830 F. Supp. 2d 550 (S.D. Ill. 2011).

**ANSWER:**    This paragraph contains legal conclusions, specifically alleged conclusions from the federal court opinion cited, to which no response is due.  To the extent a response is required, Syngenta admits that the United States District Court for the Southern District of Illinois, in *City of Greenville, Ill. v. Syngenta Crop Protection, Inc.* (Case No. 3:10-cv-00188), denied a motion filed by SAG to dismiss for lack of personal jurisdiction based on the allegations in that case, and issued a Memorandum and Order at 830 F. Supp. 2d 550 (S.D. Ill. 2011).  Syngenta denies the

legal conclusions and findings contained in that Memorandum and Order as incorrect and erroneous but, since that lawsuit was settled, did not have any opportunity to challenge the Memorandum and Order's conclusions and findings on appeal. To the extent not specifically admitted herein, denied.

95. SAG continues to exercise the unusually high degree of control over SCPLLC that led the District Court to find in 2011 that SAG was subject to jurisdiction in the State of Illinois.

**ANSWER:** This paragraph contains legal conclusions, specifically alleged conclusions from the federal court opinion cited, to which no response is due. To the extent a response is required, Syngenta admits that the United States District Court for the Southern District of Illinois, in *City of Greenville, Ill. v. Syngenta Crop Protection, Inc.* (Case No. 3:10-cv-00188), denied a motion filed by SAG to dismiss for lack of personal jurisdiction based on the allegations in that case, and issued a Memorandum and Order at 830 F. Supp. 2d 550 (S.D. Ill. 2011), which speaks for itself. Syngenta denies the legal conclusions and findings contained in that Memorandum and Order as incorrect and erroneous but, since that lawsuit was settled, did not have any opportunity to challenge the Memorandum and Order's conclusions and findings on appeal. To the extent not specifically admitted herein, denied.

96. SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Illinois in the ways previously alleged as to SCPLLC.

**ANSWER:** Syngenta denies the allegations.

### B. Paraquat manufacture, distribution, and sale

97. ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955.

**ANSWER:**   Syngenta admits that the herbicidal properties of paraquat were discovered by individuals working at ICI in 1955. To the extent not specifically admitted herein, denied.

98.   The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

**ANSWER:**   Syngenta admits that individuals working at ICI developed the active ingredient in paraquat in the 1960s.  Syngenta lacks knowledge of the remaining allegations and therefore denies them.

99.   ICI produced the first commercial paraquat formulation and registered it in England in 1962.

**ANSWER:**   Admitted.

100.   Paraquat was marketed in 1962 under the brand name Gramoxone.

**ANSWER:**   Admitted that paraquat was marketed in certain geographies in 1962. Denied that paraquat was sold in the United States in 1962.

101.   Paraquat first became commercially available for use in the United States in 1964.

**ANSWER:**   Syngenta admits that paraquat was first approved in the United States in 1964. To the extent not specifically admitted herein, denied.

102.   SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Illinois, where they registered such products with the Illinois Department of Agriculture to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

**ANSWER**:   Syngenta admits that certain companies affiliated with Syngenta have manufactured, formulated, distributed, and sold paraquat for use in the United States, and has registered paraquat with the EPA and the Illinois Department of Agriculture.  To the extent not specifically admitted herein, denied.

103.    SAC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

**ANSWER**:    Syngenta admits that certain companies affiliated with Syngenta have submitted studies to support paraquat reregistration review with the EPA.  To the extent not specifically admitted herein, denied.

104.    SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Illinois, where they registered such products with the Illinois Department of Agriculture to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

**ANSWER**:   Syngenta admits that certain companies affiliated with Syngenta have manufactured, formulated, distributed, and sold paraquat for use in the United States since at least 2007, including for sale in Illinois. To the extent not specifically admitted herein, denied.

105.    SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of

paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

**ANSWER:**    Syngenta admits that certain companies affiliated with Syngenta have submitted studies to support paraquat reregistration review with the EPA.  To the extent not specifically admitted herein, denied.

106.    Between approximately 1989 to present, Plaintiff who is licensed to apply paraquat —was repeatedly exposed to and inhaled, ingested, or absorbed paraquat in the course of mixing paraquat, filling tanks with paraquat, and applying it to fields and ditches in and around Illinois.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

107.    On information and belief, between approximately 1989-present, paraquat was sold to owners or operators of farms and applied, using ground-based or aerial sprayers, in the vicinity of Illinois where Plaintiff lived and worked.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them

108.    Plaintiff was diagnosed with PD in approximately February 2017.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to these allegations, and therefore denies them.

109.    No doctor or any other person told Plaintiff before approximately Spring 2021 that his PD was caused or could have been caused by exposure to paraquat.

**ANSWER:**    Syngenta denies that exposure to paraquat can cause Parkinson's disease.  Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

110.    Before approximately Spring 2021, Plaintiff had never read or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

111.    Before approximately Spring 2021, Plaintiff had never read or heard of any lawsuit alleging that paraquat causes Parkinson's disease.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

112.    At no time when using paraquat himself or prior to approximately Spring 2021 was Plaintiff aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

**ANSWER:**    Syngenta denies that exposure to paraquat can cause Parkinson's disease.  Syngenta lacks sufficient knowledge or information to form a belief as to the remainder of the allegations, and therefore denies them.

113.    The paraquat to which Plaintiff was exposed was sold and used in Illinois, and was manufactured, distributed, and on information and belief, sold by one or more of the Defendants

and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Illinois.

**ANSWER:**   Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

114.   On information and belief, Plaintiff was exposed to paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of his exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

**ANSWER:**   Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

115.   On information and belief, Plaintiff was exposed to paraquat that was sold and used in Illinois and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Illinois.

**ANSWER:**   Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

116.   On information and belief, Plaintiff was exposed to paraquat that was sold and used in Illinois, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

### C.    Paraquat use

117.    Since 1964, paraquat has been used in the United States to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

**ANSWER:**    Syngenta admits that paraquat was first registered as a pesticide in the United States in 1964, that it is registered for the control of broadleaf weeds and grass, and that it may be used as an herbicide, desiccant, and/or defoliant for a variety of crops. To the extent not specifically admitted herein, denied.

118.    At all relevant times, where paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable. The use of Defendants' paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

**ANSWER:**    Syngenta admits that, as indicated on the product label and instructions for use, multiple applications of paraquat may be used in a single growing season for some crops and in some contexts.  To the extent not specifically admitted herein, denied.

119.    At all relevant times, paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom

they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

**ANSWER:**   Syngenta admits that paraquat is most commonly sold in liquid form and is designed to be diluted. Syngenta further admits that paraquat is sometimes sold with a recommendation that it be mixed with other liquids.  To the extent not specifically admitted herein, denied.

120.    At all relevant times, concentrates containing paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

**ANSWER:**   The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context and that will be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

121.    At all relevant times, paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

**ANSWER:**   Syngenta admits that, depending on the crop and context, and subject to the instructions for use, applicator training, and relevant regulations, paraquat may be applied in

various ways, including aerially or by groundboom, backpack sprayer, and low pressure handwand. Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

### D.    Paraquat exposure

122.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

**ANSWER:**    Syngenta denies the allegations.

123.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

**ANSWER:**    Syngenta denies the allegations.

124.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

**ANSWER:**    Syngenta denies the allegations.

125.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

126.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

127.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

128.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

129.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

130.    At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

131.    At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. To the extent not specifically admitted herein, denied.

### E.    Parkinson's disease

132.    PD is progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, admitted.  To the extent not specifically admitted herein, denied.

133.    Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

1.    *Symptoms and treatment*

134.    The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context and that will be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that individuals with Parkinson's disease may experience the symptoms listed; individuals without Parkinson's disease may also experience some or all of these symptoms.  To the extent not specifically admitted herein, denied.

135.    PD's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context.  The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that individuals with Parkinson's disease may experience the motor symptoms listed; individuals without Parkinson's disease may also experience some or all of these symptoms.  To the extent not specifically admitted herein, denied.

136.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of PD, often for years before any of the primary motor symptoms appear.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits non-motor symptoms like those listed can occur in some individuals with Parkinson's disease, and can occur in some individuals with Parkinson's disease before what the Complaint characterizes as the "primary" motor symptoms; individuals without Parkinson's disease may also experience some or all of these non-motor symptoms.  To the extent not specifically admitted herein, denied.

137.    There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  Syngenta denies that there are no available treatments for Parkinson's disease.  Subject to those qualifications, and within the narrow context of this legal filing, admitted that there is currently no known cure for Parkinson's disease. To the extent not specifically admitted herein, denied.

2.    *Pathophysiology*

138.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that the death of dopaminergic neurons in the substantia nigra pars compacta is a major, but not exclusive, finding of Parkinson's disease. To the extent not specifically admitted herein, denied.

139.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits dopamine is a neurotransmitter.  To the extent not specifically admitted herein, denied.

140.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context.

The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that with the loss of dopaminergic neurons, there is a corresponding decrease of dopamine. To the extent not specifically admitted herein, denied.

141.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that dopaminergic neurons are not replaced once they die; if enough dopaminergic neurons die, dopamine production may fall below the level the brain requires for proper control of motor function, which may result in motor control symptoms that may be consistent with those found in individuals diagnosed with Parkinson's disease. To the extent not specifically admitted herein, denied.

142.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. To the extent not specifically admitted herein, denied.

143.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that certain scientists have hypothesized that dopaminergic neurons may be damaged by oxidative stress depending on the experimental circumstances.  To the extent not specifically admitted herein, denied.

144.    Scientists who study PD generally agree that oxidative stress is a major factor in— if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that certain scientists have hypothesized that oxidative stress may be a contributor to Parkinson's disease.  To the extent not specifically admitted herein, denied.

F.    **Paraquat's toxicity**

145.    Paraquat is highly toxic to both plants and animals.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.  The

allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that paraquat may be acutely toxic to plants and animals under certain circumstances. To the extent not specifically admitted herein, denied.

146. Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that paraquat is an herbicide that may injure or kill plants under certain circumstances, and that farmers use it to eliminate weeds. To the extent not specifically admitted herein, denied.

147. Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta denies that when used as directed, paraquat injures or kills humans or animals. Syngenta admits that under certain circumstances if paraquat is misused (if humans or animals drink paraquat, for example), paraquat may injure or kill humans or animals. To the extent not specifically admitted herein, denied.

148. Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and

it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.  The allegations will also be the subject of expert testimony.  To the extent a response is required, denied.

149.    The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.  The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, and as phrased, admitted.  To the extent not specifically admitted herein, denied.

150.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.  The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within

the narrow context of this legal filing, and as phrased, admitted.  To the extent not specifically admitted herein, denied.

151.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical.

**ANSWER:**    The allegations contained in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.   The allegations will also be the subject of expert testimony.   Subject to those qualifications, and within the narrow context of this legal filing, and as phrased, denied.

152.    Paraquat's redox properties have been known since at least the 1930s.

**ANSWER:**    The allegations contained in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.   The allegations will also be the subject of expert testimony.   Subject to those qualifications, and within the narrow context of this legal filing, and as phrased, admitted.

153.    That paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, admitted.  To the extent not specifically admitted herein, denied.

154.    The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. To the extent not specifically admitted herein, denied.

### G.    Paraquat and Parkinson's disease

155.    The same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons—paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific and medical matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony.  To the extent not specifically admitted herein, denied.

156.    Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features of PD.

49

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.    The allegations will also be the subject of expert testimony.  Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that Parkinson's disease does not occur in any species other than humans and that researchers have never produced Parkinson's disease in any animals by exposing them to paraquat.  To the extent not specifically admitted herein, denied.

157.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Subject to those qualifications, and within the narrow context of this legal filing, Syngenta admits that there are many publicly available studies that have studied the effects of paraquat and other compounds in various animal species, but Parkinson's disease does not occur in any species other than humans and researchers have never produced Parkinson's disease in any animals by exposing them to paraquat. To the extent not specifically admitted herein, denied.

158.    In animal models of PD, hundreds of studies involving various routes of exposure have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context.    The

allegations will also be the subject of expert testimony. To the extent not specifically admitted herein, denied.

159.    Hundreds of in vitro studies have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. To the extent not specifically admitted herein, denied.

160.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and PD, including multiple studies finding a two- to five-fold or greater increase in the risk of PD in populations with occupational exposure to paraquat compared to populations without such exposure.

**ANSWER:**    The allegations in this paragraph are simplified and incomplete characterizations of complex scientific matters that should be considered with full and appropriate context. The allegations will also be the subject of expert testimony. Syngenta denies that paraquat causes Parkinson's disease. Syngenta further states that numerous epidemiological studies have found no statistically significant association between Parkinson's disease and measures of paraquat exposure. Syngenta denies that any of the unspecified studies referenced in this paragraph that purport to suggest an association have found a causal relationship between paraquat and Parkinson's disease. As the authors of such studies frequently acknowledge, they suffer from a number of methodological limitations, including among other things, their ability to reliably measure exposure to paraquat. To the extent not specifically admitted herein, denied.

H.     **Paraquat regulation**

161.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

162.    As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

163.    As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

164.    FIFRA does not require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

165.    The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.     its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

b.     its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

c.     it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

d.     when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

**ANSWER:**   This paragraph contains legal conclusions to which no response is due.

166.    FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

**ANSWER:**   This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that Plaintiff accurately quotes one definition of "unreasonable adverse effects on the environment" under 7 U.S.C. § 136(bb), but denies that Plaintiff has completely and accurately explained the terms of this provision.

167.    Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

**ANSWER:**   This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that Plaintiff accurately quoted a portion of 7 U.S.C. § 136a(f)(2), with the exception of replacing "the subchapter" with "[FIFRA]," but denies that Plaintiff has completely and accurately explained the terms of this provision.

168.    However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that Plaintiff accurately quoted a portion of 7 U.S.C. § 136a(f)(2), with the exception of replacing "the subchapter" with "[FIFRA]," but denies that Plaintiff has completely and accurately explained the terms of this provision.

169.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that Plaintiff accurately quoted a portion of 7 U.S.C. § 136j(a)(1)(E), but denies that Plaintiff has completely and accurately explained the terms of this provision.

170.    A pesticide is misbranded under FIFRA if, among other things:

    a.    its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

    b.    the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

    c.    the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

171.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly,

any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff bring claims and seek relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

## V.    ALLEGATIONS COMMON TO SPECIFIC CAUSES OF ACTION

### A.    Strict product liability - design defect

172.    At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. paraquat business.

**ANSWER:**    Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture and sale of paraquat.  Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

173.    At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture and sale of paraquat.  Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

174.    Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

175.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

      a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**    Syngenta denies the allegations.

176.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured,

distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

**ANSWER:**    Syngenta denies the allegations.

177.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

**ANSWER:**    Syngenta denies the allegations.

178.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

**B.    Strict product liability - failure to warn**

179.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

**ANSWER:**   This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture, distribution, and sale of paraquat.  Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

180.   Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

**ANSWER:**   Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

181.   When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

    a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**   Syngenta denies the allegations.

182.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

      a.    it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b.    it was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**<u>ANSWER:</u>**    This paragraph contains legal conclusions to which no response is due.

183.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

**<u>ANSWER:</u>**    Syngenta denies the allegations.

184.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner

reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

**ANSWER:**    Syngenta denies the allegations.

185.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

### C.    Negligence

186.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture, distribution, and sale of paraquat.  Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

187.    Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

188.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

189.    At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is required, Syngenta denies the allegations.

190.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who

used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.     when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**    Syngenta denies the allegations.

191.    In breach of the aforementioned duty to Plaintiff, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

a.     failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.     designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

c.     failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.     failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.    failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.    failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.    failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.    failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**    Syngenta denies the allegations.

### D.    Public nuisance

192.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

193.    Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

194.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

195.    At all times relevant to this claim, Plaintiff had the right to a healthful environment while living and working in the State of Illinois.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

196.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to the public, including Plaintiff and other persons whom they could reasonably foresee were likely to be in or near places where paraquat was being or recently had been used within the State of Illinois, to provide and maintain a healthful environment in connection with their design, manufacture, distribution, and sale of pesticides, including paraquat, in or for use within the State of Illinois.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

197.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Plaintiff was exposed, it was reasonably foreseeable to Defendants, Defendants' corporate predecessors, and others with whom they acted in concert that Plaintiff and other members of the public were likely to be in or near places where paraquat was being or recently had been used.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

198.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used the intended and directed manner or a reasonably foreseeable manner:

    a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed.

Therefore, no response is required.

199.    In breach of the aforementioned duty to members of the public, including Plaintiff, in manufacturing, distributing, and selling paraquat for use in the State of Illinois, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

a.    failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.    designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

c.    failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.    failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.    failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

   f.    failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

   g.    failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

   h.    failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**   Pursuant to the Court's February 14, 2022 Order, this count has been dismissed. Therefore, no response is required.

### E.    Illinois Consumer Fraud and Deceptive Business Practices Act

200.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

**ANSWER:**   This paragraph calls for legal conclusions to which no response is due. To the extent a response is required, Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture, distribution, and sale of

paraquat. Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

201.    Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois and that Plaintiff used for the purpose of controlling weeds and not for resale.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

202.    Plaintiff used merchandise, namely paraquat, from Defendants and Defendants' corporate predecessors, and others with whom they acted in concert.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

203.    Defendants and Defendants' corporate predecessors and others with whom they acted in concert, concealed, suppressed, and omitted to disclose to Plaintiff the harmful side effects of paraquat in that they:

    a.    concealed, suppressed, or omitted to disclose that paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    b.    concealed, suppressed, or omitted to disclose that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

c.       concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.       concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.       concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.       concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**     Syngenta denies the allegations.

204.   Defendants and Defendants' corporate predecessors, and others with whom they acted in concert intended that Plaintiff would rely on their concealment, suppression, and omissions regarding paraquat.

**ANSWER:**     Syngenta denies the allegations.

205.    The concealment, suppression, and omissions of Defendants and Defendants' corporate predecessors, and others with whom they acted in concert, were material to Plaintiff's purchase of paraquat.

**ANSWER:**    Syngenta denies the allegations.

206.    Plaintiff acted as a reasonable consumer would in light of all circumstances in purchasing paraquat.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

207.    The unlawful methods, acts, and practices engaged in by Defendants and Defendants' corporate predecessors, and others with whom they acted in concert, would cause a reasonable person to purchase paraquat.

**ANSWER:**    Syngenta denies the allegations.

208.    As a direct and proximate cause of the concealment, suppression, and omissions of Defendants and Defendants' corporate predecessors, and others with whom they acted in concert, Plaintiff suffered ascertainable loss and actual damages, including that Plaintiff developed PD, and suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and incurred financial expenses for hospitalization and medical care.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

### F.    Breach of implied warranty of merchantability

209.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling paraquat and other restricted-use pesticides and themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due. To the extent a response is due, Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacturing, distribution, and sale of paraquat. Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

210.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    To the extent a response is required, Syngenta admits that certain Syngenta entities, affiliates, and predecessors have, at different points in time, been involved in the manufacture, distribution, and sale of paraquat. Syngenta lacks sufficient knowledge or information to form a belief as to the remaining allegations, and therefore denies them.

211.    Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

**ANSWER:**    Syngenta lacks sufficient knowledge or information to form a belief as to the allegations, and therefore denies them.

212.    At the time of each sale of paraquat to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used, pursuant to Section 2-314 of the Uniform Commercial Code, 810 ILCS 5/2-314.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.

213.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

**ANSWER:**    Syngenta denies the allegations.

**COUNT 1**
**DEFENDANTS SCPLLC AND SAG**
**STRICT PRODUCT LIABILITY - DESIGN DEFECT**
**PERSONAL INJURIES**

214.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

**ANSWER:**    Syngenta incorporates by reference each response set forth in the preceding responses as if fully restated herein.

215.    As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**ANSWER:**    Syngenta denies the allegations.

**COUNT 2**
**DEFENDANTS SCPLLC AND SAG**
**STRICT PRODUCT LIABILITY - FAILURE TO WARN**
**PERSONAL INJURIES**

216.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

**ANSWER:**    Syngenta incorporates by reference each response set forth in the preceding responses as if fully restated herein.

217.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have

earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**ANSWER:**   Syngenta denies the allegations.

### COUNT 3
### DEFENDANTS SCPLLC AND SAG
### NEGLIGENCE
### PERSONAL INJURIES

218.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

**ANSWER:**   Syngenta incorporates by reference each response set forth in the preceding responses as if fully restated herein.

219.   As a direct and proximate result of the negligence of SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**ANSWER:**   Syngenta denies the allegations.

### COUNT 4
### DEFENDANTS SCPLLC AND SAG
### PUBLIC NUISANCE
### PERSONAL INJURIES

220.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

**ANSWER:**   Syngenta incorporates by reference each response set forth in the preceding responses as if fully restated herein.

221.    As a direct and proximate result of the public nuisance created by SCPLLC, SAG,

their corporate predecessors, and others with whom they acted in concert, Plaintiff developed PD;

has suffered severe and permanent physical pain, mental anguish, and disability, and will continue

to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do

so for the remainder of his life; has lost income that he otherwise would have earned and will

continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary

medical treatment and will continue to do so for the remainder of his life.

**ANSWER:**    Pursuant to the Court's February 14, 2022 Order, this count has been dismissed.

Therefore, no response is required.

### COUNT 5
### DEFENDANTS SCPLLC AND SAG
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### PERSONAL INJURIES

222.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

**ANSWER:**    Syngenta  incorporates by reference each response set forth in the preceding

responses as if fully restated herein.

223.    As a direct and proximate result of the violations of the Illinois Consumer

Protection Act by SCPLLC, SAG, their corporate predecessors, and others with whom they acted

in concert, Plaintiff developed PD; has suffered severe and permanent physical pain, mental

anguish, and disability, and will continue to do so for the remainder of his life; has suffered the

loss of a normal life and will continue to do so for the remainder of his life; has lost income that

he otherwise would have earned and will continue to do so for the remainder of his life; and has

incurred reasonable expenses for necessary medical treatment and will continue to do so for the

remainder of his life.

**ANSWER:**    Syngenta denies the allegations.

## COUNT 6
## DEFENDANTS SCPLLC AND SAG
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## PERSONAL INJURIES

224.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

**ANSWER:**    Syngenta incorporates by reference each response set forth in the preceding responses as if fully restated herein.

225.    As a direct and proximate result of the breaches of the implied warranty of merchantability by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**ANSWER:**    Syngenta denies the allegations.

## PRAYER FOR RELIEF

226.    As a result of the foregoing, Plaintiff respectfully request that this Court enter judgment in his favor and against Defendants, jointly and severally, for compensatory damages, costs, pre- and post judgment interest, and attorneys' fees, severally for punitive damages, and for such further relief to which he may show himself to be entitled.

**ANSWER:**    This paragraph contains legal conclusions to which no response is due.  To the extent a response is due, denied.

## DEMAND FOR JURY TRIAL

227.    Pursuant to FED. R. Civ. P. 38(b), Plaintiff respectfully demands a jury trial on all issues triable by jury.

**ANSWER:**    Syngenta hereby demands a trial by jury on all claims so triable.

## RESERVATION OF RIGHTS AND DEFENSES

### GENERAL DENIAL

Syngenta generally denies liability for all claims alleged in the Complaint and denies each allegation that has not been expressly admitted herein.

### INCORPORATION BY REFERENCE

Syngenta states that on February 14, 2022, the Court issued a ruling that plaintiffs failed to state claims for public nuisance and that claims without a Minnesota connection could not proceed under Minnesota's consumer protection laws. ECF No. 954 at 25, 32-33. Syngenta hereby incorporates that ruling by reference.

### DEFENSES AND AFFIRMATIVE DEFENSES

Syngenta generally denies liability for all claims alleged in the Complaint and denies each allegation that has not been expressly admitted herein. By including these defenses in this Answer, Syngenta is not assuming the burden of proof on any such defense and is not conceding that Syngenta bears any burden of proof on these defenses, except as required by law. Syngenta reserves the right to assert additional defenses or otherwise supplement this Answer upon discovery of additional facts or evidence.

### CHOICE OF LAW

For purposes of the affirmative defenses, Syngenta applies the law of Illinois. To the extent the Court determines that a different state's law applies to all or some of these defenses, Syngenta hereby applies the law of that state (or states).

## FIRST AFFIRMATIVE DEFENSE
### (Any Liability Attributable to Plaintiff or Others)

If there is any negligence or liability of any of the parties named herein, it is the sole and exclusive negligence and liability of the other entities or individuals, and not of Syngenta.

## SECOND AFFIRMATIVE DEFENSE
### (Failure to State a Cause of Action)

The Complaint, and each cause of action therein, fails to state facts sufficient to constitute a cause of action upon which relief may be granted.

## THIRD AFFIRMATIVE DEFENSE
### (No Personal Jurisdiction)

To the extent that Plaintiff's alleged injuries arise out of or relate to Syngenta's alleged activities outside the State of Illinois, the Court lacks personal jurisdiction over Syngenta.

## FOURTH AFFIRMATIVE DEFENSE
### (EPA Has Primary Jurisdiction)

Plaintiff's claims are barred because the Environmental Protection Agency has primary jurisdiction over Plaintiff's claims under FIFRA, 7 U.S.C. § 136 et seq., which vests the EPA with authority to regulate labeling and packaging requirements for herbicides, including paraquat.

## FIFTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

Plaintiff's claims are barred in whole or in part by the applicable provisions of the pertinent statutes of limitations, including but not limited to, 735 Ill. Comp. Stat. Ann. 5/13-202, 5/13-203, 810 Ill. Comp. Stat. Ann. 5/2-725, and 815 Ill. Comp. Stat. Ann. 505/10a(e).

## SIXTH AFFIRMATIVE DEFENSE

**(Statute of Repose)**

Plaintiff's claims are barred in whole or in part by the applicable provisions of the pertinent statutes of repose including but not limited to, 735 Ill. Comp. Stat. Ann. 5/13-213.

## SEVENTH AFFIRMATIVE DEFENSE
### (Federal Preemption)

Plaintiff's claims against Syngenta are barred, in whole or in part, by the Supremacy Clause, Article VI, Section 2, of the United States Constitution, because those claims are preempted by federal law, including but not limited to the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq. ("FIFRA"), because they seek to impose "requirements for labeling and packaging in addition to or different from those required" under FIFRA 7 U.S.C. § 136vb.

## EIGHTH AFFIRMATIVE DEFENSE
### (Conflict Preemption)

Plaintiff's claims against Syngenta are barred, in whole or in part, by the doctrine of conflict preemption because Plaintiff's claims "stand[ ] as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress" under FIFRA. *Grier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2002).

## NINTH AFFIRMATIVE DEFENSE
### (Compliance with FIFRA)

The conduct of Syngenta, and the characteristics and other properties of paraquat-containing products sold by Syngenta (including the labels and warnings for paraquat-containing products) at all times complied with FIFRA, its implementing regulations, and other mandates imposed by the United States Department of Agriculture ("USDA") and the Environmental Protection Agency ("EPA") with respect to pesticides. 7 U.S.C. § 136 et seq.

## TENTH AFFIRMATIVE DEFENSE

**(ICFA Claims)**

Plaintiff's claims under the ICFA, 815 Ill. Comp. Stat. Ann. 505/1 et seq. are barred because the ICFA does not apply to personal injury claims or loss of consortium claims, *Morris v. Harvey Cycle & Camper, Inc.*, 911 N.E.2d 1049, 1053 (Ill. App. Ct. 2009); *Cooney v. Chi. Pub. Sch.*, 943 N.E.2d 23, 31 (Ill. App. Ct. 2010), and because they are unconstitutional under the Freedom of Speech Clause of the First Amendment of the U.S. Constitution, *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011).

## ELEVENTH AFFIRMATIVE DEFENSE
### (Double Recovery)

Plaintiff's claims are barred to the extent they seek double recovery that is impermissible under Illinois law for wrongful death pursuant to 740 Ill. Comp. Stat. Ann. 180/0.01 et seq., and loss of consortium under common law. *Knierim v. Izzo*, 22 Ill.2d 73, 82–83, 174 N.E.2d 157, 162–63 (1961) ("We hold that the differences between an action for loss of consortium resulting from the death of a husband and an action for pecuniary loss under the Wrongful Death Act are not sufficiently significant to warrant us recognizing the action for loss of consortium as an additional remedy available to the widow."). "Illinois law recognizes loss of consortium as an element of damages under the Wrongful Death Act, but not as a separate cause of action in a wrongful death case." *Nielsen v. United States*, 1995 WL 88796, at *2 (N.D. Ill. 1995) (citing *Knierim*, 22 Ill.2d at 82–83).

## TWELFTH AFFIRMATIVE DEFENSE
### (Compliance with Standards of Care and Regulations; Products Not Defective)

Plaintiff's claims must be dismissed because Syngenta's paraquat-containing products were properly manufactured, marketed, and distributed, were not defective in any manner, were at all relevant times reasonably fit and suited for the purpose for which they were manufactured, and

were delivered with sufficient advice and warnings that were consistent with the state of the existing scientific, medical, technological, and industrial knowledge. Syngenta complied with all applicable government standards and regulations and all applicable standards of care under all laws, regulations, industry practice, and state-of-the-art knowledge.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (No Causation and/or Proximate Causation)

Plaintiff's claims are barred because Plaintiff's alleged injuries and damages, which injuries and damages at all times are denied, were not legally or proximately caused by any acts or omissions by Syngenta and/or were caused, if at all and to the extent such causation can even be identified, by the conduct of Plaintiff himself, third parties over which Syngenta had no authority or control, and/or events and conditions wholly unrelated to Syngenta. Syngenta cannot be held liable for loss or damage caused by such independent persons or entities, whether or not they are parties to this action.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Good Faith)

Any and all actions taken by Syngenta with respect to any of the matters alleged in the Complaint were taken in good faith and in accordance with established practice.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Due Care)

Plaintiff's claims are barred, in whole or in part, because Syngenta exercised due care and took appropriate precautions against any reasonably foreseeable acts or omissions of third parties and any reasonably foreseeable consequences of such acts or omissions.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (No Duty to Warn)

Syngenta had no duty to warn Plaintiff of any risks attendant to the use or application of its products beyond those requiring disclosure by the EPA and/or any other federal laws or regulations, and specifically denies it had any duty to warn of the alleged risks identified by Plaintiff in the Complaint or that such risks exist or existed. Syngenta is entitled to rely upon knowledgeable, learned and sophisticated market intermediaries, suppliers and applicators to pass on necessary warnings, if any.

### SEVENTEENTH AFFIRMATIVE DEFENSE
### (Plaintiff's Fault or Negligence)

In the event that Plaintiff establishes liability on the part of Syngenta, which liability is specifically denied, Syngenta avers that any injury or damages alleged in the Complaint were caused by the contributory or comparative negligence and/or fault of Plaintiff, thereby barring Plaintiff' recovery in whole or in part.

### EIGHTEENTH AFFIRMATIVE DEFENSE
### (Assumption of Risk)

Plaintiff assumed the risk of or consented to any injury or damages alleged in the Complaint, thereby barring any recovery in whole or in part by Plaintiff herein.

### NINETEENTH AFFIRMATIVE DEFENSE
### (Awareness of Product's Condition)

If the product allegedly involved in this action was defective or unreasonably dangerous, which Syngenta expressly denies, Plaintiff was aware thereof and unreasonably proceeded to make use of the product in that condition..

### TWENTIETH AFFIRMATIVE DEFENSE
### (Misuse, Abuse, or Alteration of Products)

There can be no liability against Syngenta to the extent Plaintiff's alleged damages were caused by a misuse, abuse, and/or alteration of any Syngenta product, or the failure to act in accordance with the labels and directions provided by Syngenta and/or others.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

Plaintiff's claims are barred in whole or in part because Plaintiff failed to mitigate his alleged injuries and damages, or both.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
### (Waiver, Estoppel, Laches, Unclean Hands)

Plaintiff's claims are barred, in whole or in part, based on the equitable doctrines of waiver, estoppel, laches, unclean hands, and/or *in pari declicto*.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

Plaintiff's claims against Syngenta for damages are barred, in whole or in part, because Plaintiff would be unjustly enriched if allowed to recover any portion of the damages alleged in the Complaint.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
### (Consequential, Special, Indirect or Incidental Damages)

Plaintiff's claims are barred, in whole or in part, by Syngenta's disclaimer language, including, but not limited to, disclaimer language on its product label(s).

### TWENTY-FIFTH AFFIRMATIVE DEFENSE
### (Speculative Damages)

Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages are legally uncertain, remote, indirect, and/or speculative.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE
### (No Right/Entitlement to Attorneys' Fees)

Plaintiff fails to state a claim upon which attorneys' fees may be awarded.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### (Several Liability)

Plaintiff is barred from recovery to the extent his own negligence contributed to his alleged injuries and damages in an amount equal to or more than fifty percent (50%), as dictated by 735 Ill. Comp. Stat. Ann. § 5/2-1116. To the extent Plaintiff's negligence contributed to his own alleged injuries and damages in an amount of fifty percent or less (50%), any recovery should be reduced to an amount equal to the share of the injuries and damages attributable to the comparative fault and/or negligence of each Plaintiff on those counts applicable to each. *Id.*

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE
### (Contribution, Indemnity, and Offset)

Syngenta reserves all rights of contribution and/or indemnity and for the apportionment of fault against Plaintiff and any other persons or entities to the fullest extent permitted. Syngenta expressly reserves the right, in the event that one or both Plaintiff settle with other persons or entities, to seek a credit or offset for any portion of any Plaintiff's alleged injuries that may be attributed to such other persons or entities. Syngenta is entitled to offset against any judgment entered against it of all amounts recovered by or benefiting Plaintiff, and resulting from any settlement, judgment or any other basis permitted by law.

## TWENTY-NINTH AFFIRMATIVE DEFENSE
### (Punitive Damages)

To the extent Plaintiff seeks punitive and/or exemplary damages, Plaintiff is barred from recovering punitive and/or exemplary damages because Plaintiff fails to state facts sufficient to state a claim for punitive and/or exemplary damages and Syngenta committed no acts justifying an award of punitive and/or exemplary damages.

## THIRTIETH AFFIRMATIVE DEFENSE

**(Statutory Limitations on Recovery)**

Any damages recovered by Plaintiff from Syngenta must be limited by the applicable statutory ceilings on recoverable damages.

## RESERVATION OF RIGHTS AND DEFENSES

Syngenta's pleading is based on its reasonable investigation of Plaintiff's claims to date. Syngenta has not knowingly or intentionally waived any applicable defenses and reserves the right to assert and rely on such other applicable defenses as may become available or apparent during discovery proceedings. Syngenta reserves the right to amend its Answer and/or Affirmative Defenses accordingly, and/or withdraw Affirmative Defenses that it determines to be inapplicable during the course of subsequent discovery. Additionally, Syngenta reserves its rights regarding preemption, which it has contested.

Dated: April 13, 2022              Respectfully submitted,

*/s/ Ragan Naresh*
Ragan Naresh
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 389-5000
ragan.naresh@kirkland.com

Leslie Smith
Brad Weidenhammer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: (312) 862-2000
leslie.smith@kirkland.com
bweidenhammer@kirkland.com

*Attorneys for Syngenta Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 13, 2022, I electronically filed the foregoing with the Clerk of this

Court by using the CM/ECF system, which will provide notice to all users of record.

*/s/ Ragan Naresh*
Ragan Naresh